## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**ROOSEVELT ROAD RE, LTD. and**
**TRADESMAN PROGRAM MANAGERS, LLC,**

$\qquad$ **Plaintiffs,** $\qquad$ **Case _____**

**v.**

**WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP; PHILIP RUSSOTTI; CLIFFORD H. SHAPIRO; KENNETH HALPERIN; I. BRYCE MOSES; BANGEL, COHEN & FALCONETTI, LLP; DAVID J. BANGEL; STEPHEN H. COHEN; CHRISTOPHER M. FALCONETTI; NY ORTHO, SPORTS MEDICINE & TRAUMA, P.C.; JEFFREY STONE KAPLAN, MD; MATTHEW P. GRIMM, MD; JOSEPH WEINSTEIN, D.O., P.C.; JOSEPH WEINSTEIN, DO; CARLOS CASTRO, MD; ANDREW MEROLA, MD; KOLB RADIOLOGY P.C.; THOMAS M. KOLB, MD; LENOX HILL RADIOLOGY AND MEDICAL IMAGING ASSOCIATES, P.C.; RJ PHYSICAL THERAPIST, P.C.; CROSS BAY ORTHOPEDIC SURGERY P.C.; PETER TOMASELLO, JR., DO; NYC MEDICAL & NEUROLOGICAL OFFICES, P.C.; MEHRDAD GOLZAD, MD; HUDSON PRO ORTHOPAEDICS & SPORTS MEDICINE LLC; ROMAN ISAAC, MD; CITIMEDICAL I, PLLC; BL PAIN MANAGEMENT, PLLC; PAIN PHYSICIANS NY, PLLC; LEON REYFMAN, MD; BOLESLAV KOSHARSKYY, MD; SURGICARE OF BROOKLYN, LLC; INTEGRATED SPECIALTY ASC D/B/A HEALTHPLUS SURGERY CENTER, LLC; NYEEQASC, LLC D/B/A NORTH QUEENS SURGICAL CENTER; SURGICORE 5th AVENUE LLC; ROOSEVELT SURGERY CENTER, LLC D/B/A MANHATTAN SURGERY CENTER; JOHN DOE NOS. 1-25; AND XYZ CORPORATION NOS. 1-25,**

$\qquad$ **Defendants.**

---

## COMPLAINT

Plaintiffs ROOSEVELT ROAD RE, LTD. (hereinafter referred to as "Roosevelt") and TRADESMAN PROGRAM MANAGERS, LLC (hereinafter referred to as "Tradesman") (collectively referred to hereinafter as "Plaintiffs") by and through their attorneys THE WILLIS LAW GROUP, LLC, allege as follows:

### I.    JURISDICTION AND VENUE

1.    This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.    Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

### II.    THE PARTIES

#### A.    Plaintiffs

3.    Plaintiff Roosevelt Road Re, Ltd. is a foreign limited company duly organized and existing under the laws of Bermuda. At all times relevant herein, Roosevelt was authorized to conduct business in New York.

4.      Plaintiff Tradesman Program Managers, LLC is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Tradesman maintained its principal place of business in the State of New York and is authorized to conduct business in New York.

**B.      Defendants**

i.      Legal Service Defendants

5.      Defendant WINGATE, RUSSOTTI, SHAPIRO, MOSES & HALPERIN, LLP ("Wingate Firm") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, the Wingate Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

6.      Upon information and belief, Defendant PHILIP RUSSOTTI ("Russotti") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Russotti was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

7.      Upon information and belief, Defendant CLIFFORD H. SHAPIRO ("Shapiro") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Shapiro was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

8.      Upon information and belief, Defendant KENNETH HALPERIN ("Halperin") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Halperin was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

9.      Upon information and belief, Defendant I. BRYCE MOSES ("Moses" and together with Russotti, Shapiro and Halperin, the "Wingate Partners") resides in and is a citizen of the State of New York. He is a named partner of Wingate Firm. At all times relevant herein, Moses was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

10.     Wingate Partners and Wingate Firm are collectively referred to herein as the "Wingate Defendants."

11.     Defendant BANGEL, COHEN & FALCONETTI, LLP ("Bangel Firm") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, Bangel Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

12.     Upon information and belief, Defendant DAVID J. BANGEL ("Bangel") resides in and is a citizen of the State of New York. He is a named partner of Bangel Firm. At all times relevant herein, Bangel was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

13.     Upon information and belief, Defendant STEPHEN H. COHEN ("Cohen") resides in and is a citizen of the State of New York. He is a named partner of Bangel Firm. At all times relevant herein, Cohen was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

14.     Upon information and belief, Defendant CHRISTOPHER M. FALCONETTI ("Falconetti" and together with Bangel and Cohen, the "Bangel Partners") resides in and is a citizen of the State of New York. He is a named partner of Bangel Firm. At all times relevant herein,

Falconetti was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

15.    Bangel Partners and Bangel Firm are collectively referred to herein as the "Bangel Defendants."

16.    Wingate Defendants and Bangel Defendants are collectively referred to herein as the "Legal Service Defendants."

ii.    Runner Defendants

17.    Defendants JOHN DOE NOS. 1-25 (collectively "Runner Defendants") are persons of unknown citizenship who participated in the fraudulent scheme described below by recruiting construction workers into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

18.    Similar to the scheme set forth in *United States v. Rainford et al*., 110 F.4th 455 (2d Cir. 2024), Runner Defendants typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

iii.    Funding Defendants

19.    Defendants XYZ CORPORATION NOS. 1-25 (collectively, the "Funding Defendants") are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to the Legal Service Defendants, the Runner Defendants, the Claimants (defined below) and/or the Medical Provider Defendants

iv.    Medical Provider Defendants

20.    Defendant NY ORTHO, SPORTS MEDICINE & TRAUMA, P.C. ("NY Ortho") is a professional corporation duly organized and existing under the laws of the State of New York.

At all times relevant herein, NY Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

21.    Upon information and belief, Defendant JEFFREY STONE KAPLAN, MD ("Kaplan") resides in and is a citizen of the State of New York. At all relevant times, Kaplan has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was an owner, operator, officer, director and/or employee of NY Ortho.

22.    Upon information and belief, Defendant MATTHEW P. GRIMM, MD ("Grimm" and together with NY Ortho and Kaplan, the "NY Ortho Defendants"), resides in and is a citizen of the State of New York. At all relevant times, Grimm has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was an owner, operator, officer, director and/or employee of NY Ortho.

23.    Defendant JOSEPH WEINSTEIN, D.O., P.C. d/b/a Comprehensive & Orthopedic Spine Care ("Weinstein Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Weinstein Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

24.    Upon information and belief, Defendant JOSEPH WEINSTEIN, DO ("Weinstein") resides in and is a citizen of the State of New York. At all relevant times herein, Weinstein has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Weinstein Practice.

25.     Upon information and belief, Defendant CARLOS CASTRO, MD ("Castro" and together with Weinstein and Weinstein Practice, the "Weinstein Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Castro has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Weinstein Practice.

26.     Upon information and belief, Defendant ANDREW MEROLA, MD ("Merola"), resides in and is a citizen of the State of New York. At all relevant times herein, Merola has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey.

27.     Defendant KOLB RADIOLOGY P.C. ("Kolb Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Kolb Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

28.     Upon information and belief, Defendant THOMAS M. KOLB, MD ("Kolb" and together with Kolb Practice, the "Kolb Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kolb has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Kolb Practice.

29.     Defendant LENOX HILL RADIOLOGY AND MEDICAL IMAGING ASSOCIATES, P.C. ("Lenox Practice"), is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, Lenox Practice maintained

its principal place of business in the State of New York and is authorized to and does conduct business in New York.

30.     Defendant RJ PHYSICAL THERAPIST, P.C. ("RJ PT Practice") is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, RJ PT Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

31.     Defendant CROSS BAY ORTHOPEDIC SURGERY P.C. ("Cross Bay Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Cross Bay Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

32.     Defendant PETER TOMASELLO, JR., D.O. ("Tomasello" and together with Cross Bay Practice, the "Cross Bay Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Tomasello has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Cross Bay Practice.

33.     Defendant NYC MEDICAL & NEUROLOGICAL OFFICES, P.C. ("NYC MNO Practice") is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, the NYC MNO Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

34.     Defendant MEHRDAD GOLZAD, M.D. ("Golzad" and together with NYC MNO Practice, the "NYC MNO Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Golzad has been licensed or otherwise authorized to practice medicine in

the State of New York and was the owner, operator, officer, director and/or employee of NYC MNO Practice.

35.    Defendant HUDSON PRO ORTHOPAEDICS & SPORTS MEDICINE LLC ("Hudson Practice") is a professional corporation duly organized and existing under the laws of the State of New Jersey.  At all times relevant herein, Hudson Practice maintained its principal place of business in the State of New Jersey. Upon information and belief, Hudson Practice does conduct business in New York via its alter ego HUDSON PRO ORTHOPEDIC PROFESSIONAL LLC, incorporated in the State of New Jersey and authorized to conduct business in New York, though not compliant with New York State law regarding corporate practice of the professions.

36.    Defendant ROMAN ISAAC, M.D. ("Isaac" and together with Hudson Practice, the "Hudson Defendants") resides in and is a citizen of the State of New Jersey. At all relevant times herein, Isaac has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Hudson Practice.

37.    Defendant CITIMEDICAL I, PLLC ("CitiMed Practice"), is a professional limited liability company duly organized and existing under the laws of the State of New York.  At all times relevant herein, CitiMed Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

38.    Defendant SURGICARE OF BROOKLYN, LLC ("SCOB") is a limited liability company duly organized and existing under the laws of the State of New York and is an ambulatory surgical center owned and/or operated by CitiMed Practice. At all times relevant herein, SCOB

maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

39.     Defendant INTEGRATED SPECIALTY ASC d/b/a HEALTHPLUS SURGERY CENTER, LLC ("HealthPlus SC" and together with CitiMed Practice and SCOB, the "CitiMed Defendants") is a limited liability company duly organized and existing under the laws of the State of New York and is an ambulatory surgical center owned and/or operated by CitiMed Practice. At all times relevant herein, HealthPlus SC maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

40.     Defendant BL PAIN MANAGEMENT, PLLC d/b/a Pain Management NYC ("BL Pain Practice") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, BL Pain Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

41.     Defendant PAIN PHYSICIANS NY, PLLC ("Pain Physicians Practice") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Pain Physicians Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York

42.     Defendant LEON REYFMAN, MD ("Reyfman") resides in and is a citizen of the State of New York. At all relevant times herein, Reyfman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain Practice and Pain Physicians Practice.

43.     Defendant BOLESLAV KOSHARSKYY, MD ("Kosharskyy" and together with Reyfman, BL Pain Practice, and Pain Physicians Practice, the "Pain Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain Practice and Pain Physicians Practice.

44.     Defendant NYEEQASC, LLC d/b/a North Queens Surgical Center ("NQSC") is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, NQSC maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

45.     Defendant SURGICORE 5th AVENUE LLC ("S5A") is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, S5A maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

46.     Defendant **ROOSEVELT SURGERY CENTER, LLC D/B/A MANHATTAN SURGERY CENTER** ("Manhattan SC") is a limited liability company duly organized and existing under the laws of the State of New York.  At all times relevant herein, the Manhattan SC maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

47.     The NY Ortho Defendants, Weinstein Defendants, Merola, Kolb Defendants, Lenox Practice, RJ PT Practice, Cross Bay Defendants, NYC MNO Defendants, Hudson Defendants, CitiMed Defendants, Pain Defendants, NQSC, S5A, , and Manhattan SC, are collectively referred to herein as the "Medical Provider Defendants."

48.    The Legal Service Defendants, the Runner Defendants, the Funding Defendants, and the Medical Provider Defendants are collectively referred to herein as "Defendants."

## III.    FACTUAL BACKGROUND

### A.    Fraud Scheme

49.    From at least 2018 to the present, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such construction workers; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme, and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to unlawfully enrich the Defendants and inflate the settlement value of claims and lawsuits (the "Fraud Scheme").

50.    The conspiracy shares many structural elements similar to those found in *United States v. Rainford*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> "The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little." *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024)

51.     The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1:

Figure 1.

Wingate Defendants – direct Runner Defendants to recruit Claimants; work with Funding Defendants to fund enterprise; and represent Claimants in personal injury lawsuits
Funding Defendants – provides litigation funding loans and pays Claimants and Defendants
Runner Defendants – recruit Claimants
Bangel Defendants – represent Claimants in parallel workers' compensation claims
Claimants - non-English speaking; either stage accidents or exaggerate accidents/injuries; some are or become Runners
Medical Provider Defendants – provide and seek reimbursement for fraudulent medical treatment/services to Claimants, which also inflates settlement value – see Figure 2



Figure 2.

Medical Provider Defendants – provide and seek reimbursement for fraudulent medical treatment/services to Claimants, which also inflates settlement value
Manhattan SC – operation facility for Claimants
NY Ortho, Kaplan and Grimm – evaluations, surgeries and injections for Claimants
Merola – evaluations and surgeries for Claimants
Weinstein Practice, Weinstein and Castro – evaluations and surgeries for Claimants
NQSC – operation facility for Claimants
Cross Bay Practice and Tomasello – evaluations and surgeries for Claimants
S5A – operation facility for Claimants
NYC MNO Practice and Golzad – neurological evaluations and testing for Claimants
Hudson Practice and Isaac – evaluations and surgeries for Claimants
BL Pain Practice, Pain Physicians Practice, Reyfman and Kosharskyy – evaluations and injections for Claimants
HealthPlus SC – operation facility for Claimants
CitiMed Practice – evaluations, surgeries and injections for Claimants
RJ PT Practice – physical therapy for Claimants
SCOB – operation facility for Claimants
Lenox Practice– radiographic reports for Claimants
Kolb Practice and Kolb – radiographic reports for Claimants



52.     Generally, as part of the Fraud Scheme, individuals known as runners ("Runners"), including the Runner Defendants, under the direction of the Wingate Defendants and in furtherance of the Fraud Scheme, recruited construction workers ("Claimants") into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

53.     Upon information and belief, as part of the recruitment process, Claimants were told that they would be paid workers' compensation benefits for not working if they had a work-place injury and that they would receive money in addition to workers' compensation benefits in order to cover any gap in pay.

54.     Claimants were also told that the amount of their economic benefits would increase if they had surgeries or rehabilitation, and that the economic benefits could continue for weeks or more.

55.     Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of the Wingate Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would provide treatment in furtherance of the scheme.

56.     The Runners then referred and/or transported these Claimants to Wingate Firm, where attorneys and/or other employees of Wingate Firm met with these Claimants.

57.     The Wingate Defendants represented the Claimants in personal injury lawsuits against the various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.) for purported injuries that resulted from alleged accidents on the construction projects.

58.     For workers' compensation claims made to the New York State Workers' Compensation Board ("NY WCB"), Bangel Firm routinely represented the Claimants for the same purported injuries that resulted from alleged accidents on the construction project.

59.     The Bangel Defendants and the Wingate Defendants had an agreement and understanding that Bangel Firm would represent Claimants in workers' compensation claims and Wingate Firm would represent Claimants in personal injury lawsuits, in furtherance of the Fraud Scheme.

60.     For most Claimants, both personal injury lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Defendants.

61.     In order to inflate settlement value and workers' compensation benefits and thereby effectuate higher profit for the Defendants, Wingate Defendants, Bangel Defendants, Runner Defendants and/or others under their control, directed the Claimants to seek medical diagnosis and treatment from associated medical providers, including the Medical Provider Defendants, who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

62.     Upon information and belief, in order to conceal the Claimants' actual conditions from discovery or otherwise hamper carriers' limited access to Claimants at any point, Wingate Defendants and/or Bangel Defendants would provide personnel that sometimes consisted of Runners to accompany the Claimants to all independent medical examinations under the guise of protecting the Claimants' interests.

63.     Many of the Claimants are undocumented immigrants who do not speak English, and the Claimants, as part of the Fraud Scheme, were instructed to fake their injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident.

64.     Upon information and belief, as an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Legal Service Defendants connected the Claimants to the Funding Defendants who offered high-interest litigation funding loans to Claimants. The Claimants received a portion of the high-interest funding loan proceeds and the high-interest funding loans were secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

65.     Upon information and belief, the Runners also received a portion of the Claimants' high-interest funding loan proceeds.

66.     The Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted and costly medical services and/or medical services that were not causally related to the alleged workplace accident, for which the Medical Provider Defendants received compensation from workers' compensation insurance.

67.     The Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for higher settlement values, the Legal Service Defendants will continue to funnel patients to their offices.

68.     As an incentive to provide the false medical documentation, upon information and belief, at least some Medical Provider Defendants received a portion of the loan proceeds that the

Funding Defendants provided to Claimants or maintained otherwise unnecessary liens against said recoveries in excess of the New York State Workers' Compensation Medical Fee Schedule.

69.     Armed with the fraudulently documented medical diagnoses and medical services allegedly related to the workplace accident, the Wingate Defendants fraudulently inflated the settlement values of personal injury lawsuits in order to extract greater settlements from general liability carriers, including from Plaintiff Roosevelt.

70.     Similarly, the Bangel Defendants fraudulently inflated the settlement values of workers' compensation claims in order to obtain payments to Medical Provider Defendants for unnecessary and/or unperformed services and thereafter to extract greater settlement from workers' compensation carriers, for which Plaintiff Tradesman provides administrative, investigative and support services.

71.     After settlement and payment of settlement proceeds in the personal injury action context, based on the high-interest funding loans provided to Claimants, the Funding Defendants expect to receive the bulk of such settlement proceeds, which the Funding Defendants in turn would redistribute to the Legal Service Defendants.

**B.      Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme**

72.     Defendants engaged in the Fraud Scheme resulting in a significant number of fraudulent claims being filed.  For example, on behalf of Defendants and in furtherance of the Fraud Scheme, the Legal Service Defendants represented the following individuals who were recruited by the Runner Defendants and staged an accident and/or claimed injuries unrelated to the alleged accident in claims and lawsuits the Legal Service Defendants knew were fraudulent, the Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the

claimed accident, and the Funding Defendants provided high-interest funding loans, the proceeds of which were redistributed to Defendants. The following individuals are just a fraction of the individuals who participated in the Fraud Scheme between 2018 and the present perpetrated by the Defendants. Predicate acts relating to an additional seven claimants are referenced in Exhibit A to further underscore the extent and duration of the Fraud Scheme.

i.    <u>Claimant A</u>

73.    Claimant A was allegedly injured on March 18, 2019, while working on a construction project in New York when he pulled on a pulley and the metal pulley cut and supposedly crushed his right middle finger. He reported that he fell backwards and struck his left shoulder and head. He was wearing gloves, a helmet and pads at the time.

74.    Physical examination of Claimant A at the hospital showed no tenderness of the cervical, thoracic or lumbar spine and normal range of motion for the left shoulder. Claimant A denied loss of consciousness, blurry visions, numbness and tingling to the extremities, or any symptoms consistent with a head injury.

75.    Contrary to his claims as amplified by the Legal Service Defendants and the Medical Provider Defendants, Claimant A presented to the hospital with a single discernible injury, a one-centimeter [approximate length: -------] laceration to his finger.

76.    Although Claimant A was initially represented by different firms, Claimant A was recruited by the Runner Defendants and subsequently retained Wingate Firm to represent Claimant A in two personal injury lawsuits alleging personal injuries and damages stemming from negligence at the construction site. Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant A.

77.     Upon information and belief, at some point presently unknown, Claimant A became a runner himself, operating a network of purported claimants out of his residences of record that included but was not limited to his own family members.

78.     Claimant A's family members and other recruits were similarly induced to take out litigation funding loans and otherwise participate in the fraudulent activities detailed herein.

79.     Claimant A also retained Bangel Firm to represent Claimant A before the NY WCB.

80.     Under the direction of Wingate Defendants and the care of the Medical Provider Defendants, what started out as a laceration of Claimant A's right middle finger (for which Claimant A received stitches and was sent home) became injuries to Claimant A's cervical spine, left shoulder, and left knee, for which Claimant A received physical therapy and acupuncture, multiple steroid injections from BL Pain Practice/Pain Physicians Practice, and left shoulder arthroscopy from Defendant Weinstein. Several months after the alleged accident, Claimant A complained of a new ailment – right shoulder pain – for which Defendant Weinstein performed a right shoulder arthroscopy. Fifteen months after the alleged accident, Claimant A was diagnosed with traumatic brain injury based on a fraudulent brain MRI. Claimant A also underwent spine surgery in October 2020.

81.     Based on Claimant A's medical and workers' compensation records, many of the medical services provided to Claimant A were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

82.     The Funding Defendants provided high-interest litigation funding loan to Claimant A, the proceeds of which were then redistributed to Claimant A, the Runner Defendants who

recruited Claimant A, the Medical Provider Defendants who treated Claimant A, and the Legal Service Defendants.

83.    The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant A, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

84.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

85.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant A's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant A's workers' compensation claim.

86.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant A's construction accident, the existence of and the extent of Claimant A's injuries, and the necessity of medical treatment that Claimant A received in connection with the construction accident, in order to falsely bolster and add value to Claimant A's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant A's personal injury lawsuit.

87.     Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant A for the release of Claimant A's medical records that Wingate Defendants knew or reasonably should have known were false.

ii.     <u>Claimant B</u>

88.     Claimant B was allegedly injured on September 16, 2019, his second day on the job, while working on a construction project in New York when he claimed to have slipped and fell approximately 4-5 feet, landing on his arms and right knee.

89.     As per the witness account, Claimant B merely struck his knee when he briefly lost balance and did not fall. The witness was clear that Claimant B could not have fallen as the gap was too small for that to occur.

90.     Upon information and belief, Claimant B utilized fraudulent identification documents that may have been purchased proximate to Roosevelt Avenue in Queens.

91.     Claimant B received his OSHA card from an entity that has routinely allowed unlicensed individuals to effectively direct attendees how to file legal actions, with said individuals including employees of attorneys not sued herein.

92.     Claimant B retained Wingate Firm and Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant B and filed a lawsuit on behalf of Claimant B alleging personal injuries and damages stemming from negligence at the construction site.

93.     Claimant B also retained Bangel Firm to represent him before the NY WCB.

94.     Initially, Claimant B complained of right leg and left shoulder pain, but his x-rays were negative. Claimant B was discharged from the emergency room with prescriptions for Tylenol.

95.     Thereafter, under the direction of the Legal Service Defendants and the care of the Medical Provider Defendants, Defendant Kaplan falsely diagnosed Claimant B with meniscal tear of the right knee and performed right knee arthroscopy at Manhattan SC in June 2020. Then, Defendant Kaplan diagnosed Claimant B with rotator cuff tear of the left shoulder and performed shoulder surgery at Manhattan SC in May 2021. In the meantime, Defendant Grimm, Kaplan's colleague at NY Ortho, treated Claimant B for lumbar radiculopathy and provided multiple epidural steroid injections. Defendant Grimm also referred Claimant B to Defendant Weinstein for back surgery and based on fraudulent imaging by Lenox Practice, Defendant Weinstein performed lower back surgery on Claimant B in December 2020.

96.     Based on Claimant B's medical and workers' compensation records, many of the medical services provided to Claimant B were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

97.     The Funding Defendants provided high-interest litigation funding loan to Claimant B, the proceeds of which were then redistributed to Claimant B, the Runner Defendants who recruited Claimant B, the Medical Provider Defendants who treated Claimant B, and the Legal Service Defendants.

98.     The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant B, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

99.     Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

100.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant B's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant B's workers' compensation claim.

101.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B received in connection with the construction accident, in order to falsely bolster and add value to Claimant B's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant B's personal injury lawsuit.

102.    Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant B for the release of Claimant B's medical records that Wingate Defendants knew or reasonably should have known were false.

iii.    <u>Claimant C</u>

103.    Claimant C was allegedly injured on November 20, 2018, while working on a construction project in New York. Claimant C was working on a ramp and his co-worker was also on the ramp, operating a forklift to move a dumpster. The dumpster reportedly slid and Claimant C's body was stuck between the dumpster and a wall.

104.    Much later that night, Claimant C proceeded to the hospital, where numerous tests were done, but there were no fractures reported and Claimant C was discharged home with medications and a collar, along with observed mild swelling in a single finger.

105.    Claimant C retained Wingate Firm and Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant C and filed a lawsuit on behalf of Claimant C alleging personal injuries and damages stemming from negligence at the construction site.

106.    Claimant C also retained Bangel Firm to represent Claimant C before the NY WCB.

107.    Thereafter, under the direction of the Legal Service Defendants and the care of the Medical Provider Defendants, Defendant Merola falsely diagnosed Claimant C with herniation at C4-C5 and performed spinal fusion and C4-5 arthrodesis, corpectomy. Defendant Isaac falsely diagnosed Claimant C with left shoulder tear and performed shoulder surgery. Another provider falsely attributed Claimant C's injuries as causally related to the alleged workplace accident and performed spinal injection (March 2019), nerve block (September 2019), and lumbar epidurogram (November 2019). In the meantime, Claimant C received physical therapy and acupuncture.

108.    Based on Claimant C's medical and workers' compensation records, many of the medical services provided to Claimant C were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

109.    The Funding Defendants provided high-interest litigation funding loan to Claimant C, the proceeds of which were then redistributed to Claimant C, the Runner Defendants who recruited Claimant C, the Medical Provider Defendants who treated Claimant C, and the Legal Service Defendants.

110.    The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant C, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

111.    Based on such submission of fraudulent claim documents to the NY WCB, payments. including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

112.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant C's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant C's workers' compensation claim.

113.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant C's construction accident, the existence of and the extent of Claimant C's injuries, and the necessity of medical treatment that Claimant C received in connection with the construction accident, in order to falsely bolster and add value to Claimant C's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant C's personal injury lawsuit.

114.    Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant C for the release of Claimant C's medical records that Wingate Defendants knew or reasonably should have known were false.

iv.  Claimant D

115.  Claimant D was allegedly injured on November 19, 2018, when he tripped and fell backwards on his head, back and right shoulder either while allegedly carrying garbage down stairs or while supposedly carrying cement up stairs at a construction project in New York. Claimant D was wearing a construction helmet at the time.

116.  Claimant D retained Wingate Firm and Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant D and filed a lawsuit on behalf of Claimant D alleging personal injuries and damages stemming from negligence at the construction site.

117.  Claimant D also retained Bangel Firm to represent Claimant E before the NY WCB.

118.  Initially, after completing his workload that day, Claimant D proceeded to a local hospital where he complained of neck pain, right arm pain and lower back pain, with some numbness to leg. However, imaging showed no fractures. He was discharged with directions to take Motrin as needed for pain.

119.  Thereafter, under the direction of the Legal Service Defendants and the care of the Medical Provider Defendants, Claimant D received various imaging services, evaluations, injections and surgeries by physicians with CitiMed Practice. Among other things, Claimant D received lumbar steroid injection from CitiMed physician, Mark Goodstein, MD on May 21, 2019, and a second lumbar steroid injection from Dr. Goodstein one month later on June 18, 2019, both at CitiMed's surgical center, HealthPlus SC. In July 2019, another CitiMed physician, Barbara Steele, MD, performed right shoulder arthroscopy at HealthPlus SC. Then, in June 2020, another CitiMed physician, Nazia Shah, DPM, performed right ankle arthroscopy at HealthPlus SC.

120.    Based on Claimant D's medical and workers' compensation records, many of the medical services provided to Claimant D were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

121.    The Funding Defendants provided high-interest litigation funding loan to Claimant D, the proceeds of which were then redistributed to Claimant D, the Runner Defendants who recruited Claimant D, the Medical Provider Defendants who treated Claimant D, and the Legal Service Defendants.

122.    The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant D, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

123.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

124.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant D's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant D's workers' compensation claim.

125.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant D's construction accident, the existence

of and the extent of Claimant D's injuries, and the necessity of medical treatment that Claimant D received in connection with the construction accident, in order to falsely bolster and add value to Claimant D's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant D's personal injury lawsuit.

126.    Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant D for the release of Claimant D's medical records that Wingate Defendants knew or reasonably should have known were false.

v.    Claimant E

127.    Claimant E was allegedly injured on February 26, 2021, when, while carrying a large heavy metal bin on his right shoulder, he tripped forward and fell, causing the bin to fall backwards onto his back. Claimant E reportedly landed on his knees and hit his chin and left shoulder on the floor. Claimant E subsequently changed his story and stated that he fell from a truck.

128.    Claimant E retained Wingate Firm and Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant E and filed a lawsuit on behalf of Claimant E alleging personal injuries and damages stemming from negligence at the construction site.

129.    Claimant E also retained Bangel Firm to represent Claimant E before the NY WCB.

130.    Initially, Claimant E went to an emergency room the evening after his alleged injury, where he complained of back and neck pain, left shoulder pain and knee pain. CT scans of his head, spine, knees and shoulder did not show any fractures and only degenerative/chronic changes to his cervical spine were displayed. Against medical advice, Claimant E refused further medical evaluation and was discharged.

131.    Thereafter, under the direction of the Legal Service Defendants and the care of the Medical Provider Defendants, Claimant E received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries, acupuncture and physical therapy. Among other things, Defendant Isaac performed left shoulder surgery in June 2021, left knee surgery in September 2021, and right knee surgery in February 2022. Two and a half years following the alleged accident, Defendant Isaac provided steroid injection and recommended right shoulder surgery, noting 100% temporary impairment.

132.    Based on Claimant E's medical and workers' compensation records, many of the medical services provided to Claimant E were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

133.    The Funding Defendants provided high-interest litigation funding loan to Claimant E, the proceeds of which were then redistributed to Claimant E, the Runner Defendants who recruited Claimant E, the Medical Provider Defendants who treated Claimant E, and the Legal Service Defendants.

134.    The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant E, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

135.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

136.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant E's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant E's workers' compensation claim.

137.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant E's construction accident, the existence of and the extent of Claimant E's injuries, and the necessity of medical treatment that Claimant E received in connection with the construction accident, in order to falsely bolster and add value to Claimant E's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant E's personal injury lawsuit.

138.    Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant E for the release of Claimant E's medical records that Wingate Defendants knew or reasonably should have known were false.

vi.    Claimant F

139.    Claimant F was allegedly injured on September 3, 2021, when she claims to have fallen on her side after bumping into a water pump while up ten steps on a ladder during her work on a construction project in New York.

140.    Video evidence demonstrates that this claim is fabricated in its entirety, as she deliberately let go of stair railings several steps from the bottom of a staircase in order to propel herself forward to manufacture the illusion of a fall.

141.    Upon information and belief, Claimant F is related by blood or marriage to Claimant A, who may have been her Runner Defendant.

142.    Claimant F retained Wingate Firm and Wingate Defendants directed the aggressive and unnecessary medical treatment of Claimant F and filed a lawsuit on behalf of Claimant F alleging personal injuries and damages stemming from negligence at the construction site.

143.    Claimant F also retained Bangel Firm to represent Claimant F before the NY WCB.

144.    Initially, Claimant F complained of bilateral shoulder pain and right knee pain. However, imaging showed no fractures or dislocations. She denied any loss of consciousness and her CT head scan was unremarkable. She was discharged two days later with Tylenol and Motrin.

145.    Thereafter, under the direction of the Legal Service Defendants and the care of the Medical Provider Defendants, Claimant F received a host of medical services from the Medical Provider Defendants, including imaging services, numerous surgeries, epidural injections, and physical therapy. A month after the alleged accident, Claimant F was evaluated by Defendant Golzad who falsely recorded that Claimant F fell from a 10 ft stairwell when the side rail she was holding onto collapsed. Defendant Golzad noted Claimant F's statement of loss of consciousness (despite having denied loss of consciousness at the emergency room). Following a host of scans and evaluations, Defendant Golzad falsely diagnosed Claimant F with otolithic dysfunction and post concussion syndrome.

146.    Based on Claimant F's medical and workers' compensation records, many of the medical services provided to Claimant F were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident.

147.    The Funding Defendants provided high-interest litigation funding loan to Claimant F, the proceeds of which were then redistributed to Claimant F, the Runner Defendants who recruited Claimant F, the Medical Provider Defendants who treated Claimant F, and the Legal Service Defendants.

148.    The Medical Provider Defendants and/or Bangel Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant F, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

149.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

150.    Bangel Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant F's workers' compensation claim, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from Claimant F's workers' compensation claim.

151.    Wingate Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant F's construction accident, the existence of and the extent of Claimant F's injuries, and the necessity of medical treatment that Claimant F received in connection with the construction accident, in order to falsely bolster and add value to

Claimant F's personal injury lawsuit, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from Claimant F's personal injury lawsuit.

152.    Wingate Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant F for the release of Claimant F's medical records that Wingate Defendants knew or reasonably should have known were false.

### C.    Defendants' Participation in the Fraud Scheme

153.    At all relevant times, Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Defendants participated in the operation or management of the enterprise.

### i.    Wingate Defendants' Participation in the Fraud Scheme

154.    Since 2018, the Wingate Firm has been involved in over 2,600 lawsuits, the majority of which involved purported construction work injuries, covered by various insurers and reinsurers, including Plaintiff Roosevelt as well as those serviced by Plaintiff Tradesman, in furtherance of the Fraud Scheme.

155.    Defendants Russotti, Shapiro, Moses and Halperin are the named partners of the Wingate Firm.

156.    At all times relevant. Wingate Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner Defendants to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

157.    At all times relevant, Wingate Defendants represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants'

lawsuits, assigning duties and responsibilities to attorneys/employees of Wingate Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

158.    As part of the Fraud Scheme, Wingate Defendants referred the Claimants to Bangel Defendants for representation and prosecution of the Claimants' workers' compensation claims.

159.    Wingate Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

160.    Wingate Defendants directed the Claimants to obtain high-interest funding loans from the Funding Defendants secured by settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits.

161.    Wingate Defendants received a portion of the proceeds from the high-interest funding loans provided by the Funding Defendants.

162.    Each of Wingate Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that Wingate Defendants knew or reasonably should have known were false.

163.    This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Wingate Defendants' financial gain from the lawsuits.

ii.    Bangel Defendants' Participation in the Fraud Scheme

164.    Since at least 2018, Bangel Firm has been involved in hundreds of lawsuits involving purported construction work injuries, covered by various insurers and reinsurers, including Plaintiff Roosevelt as well as those serviced by Plaintiff Tradesman, in furtherance of the Fraud Scheme.

165.    Defendants Bangel, Cohen and Falconetti are the named principals of Bangel Firm.

166.    At all relevant times, Bangel Defendants represented Claimants in personal workers' compensation claims and directed, authorized, coordinated, and controlled the prosecution of Claimants' claims, assigning duties and responsibilities to attorneys/employees of Bangel Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims.

167.    Bangel Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide fraudulent medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

168.    Based on such fraudulent medical documentation submitted to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment to Bangel Firm for distribution to the Claimants.

169.    Each of Bangel Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that Bangel Defendants knew or reasonably should have known were false.

170.    This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Bangel Defendants' financial gain from the workers' compensation claims.

iii.    Runner Defendants' Participation in the Fraud Scheme

171.    Upon information and belief, since at least 2018, the Runner Defendants have been involved in recruiting Claimants into stating and/or perpetuating fake construction accidents at various construction sites throughout New York.

172.    Upon information and belief, the Runner Defendants communicated with the Claimants and Wingate Defendant through telephone calls, texts, emails and mail.

173.    The Runner Defendants, engaged in numerous acts in furtherance of the Fraud scheme.  Among other things, the Runner Defendants referred and/or transported Claimants to Wingate Defendants so that Claimants could retain Wingate Defendants to a) direct Claimants' medical treatment from Medical Provider Defendants; b) direct Claimants to obtain high-interest funding loans from Funding Defendants; c) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuit; and d) refer Claimants to Bangel Defendants for representation and prosecution of the Claimants' workers' compensation claims.

174.    Upon information and belief, the Runner Defendants participated in meetings with Claimants and Wingate Defendants in furtherance of the Fraud Scheme.

175.    The Runner Defendants received a portion of the proceeds from the high-interest funding loans provided by the Funding Defendants.

> iv.    <u>Funding Defendants' Participation in the Fraud Scheme</u>

176.    Upon information and belief, since at least 2018, the Funding Defendants have been involved in providing high-interest funding loans to Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

177.    To incentivize Claimants to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Funding Defendants offered high-interest litigation funding loans to Claimants to be secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits, and paid Claimants a portion of the high-interest funding loan proceeds.

178.    The Funding Defendants distributed the remaining proceeds of the high-interest funding loan directly, and/or indirectly through the Wingate Defendants, to the Runner Defendants, the Medical Provider Defendants, and the Legal Service Defendants.

179.    Upon information and belief, the Funding Defendants communicated distribution of the proceeds of the funding loan through email and/or text message as well as via use of the telephone.

180.    Upon information and belief, the Funding Defendants have received or have the right to receive the majority of or significant part of the Claimants' portion of the settlement proceeds from Claimants' workers' compensation claims and/or personal injury lawsuits.

v.   NY Ortho Defendants' Participation in the Fraud Scheme

181.   Since at least 2018, the NY Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

182.   Kaplan, as an orthopedic surgeon and a principal of NY Ortho, controlled and directed the medical services provided to Claimants by NY Ortho, including a) evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents; b) referring Claimants to his colleague Grimm, also of NY Ortho, for unnecessary injections; and c) referring Claimants to other Medical Provider Defendants for radiological services.

183.   Grimm, as a physician specializing in physical medicine and rehabilitation and pain management, and upon information and belief, a principal of NY Ortho, controlled and directed the medical services provided to Claimants by NY Ortho, evaluating and providing injections that were not medically necessary and/or not causally related to the alleged accidents.

184.   As part of the Fraud Scheme, NY Ortho Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

185.   As part of the Fraud Scheme, NY Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

186.    As part of the Fraud Scheme, NY Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

187.    NY Ortho Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Kaplan, Grimm and/or any other employee/agent of NY Ortho Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

188.    NY Ortho Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Kaplan, Grimm and/or any other employee/agent of NY Ortho Practice provided medical and diagnostic services and received reimbursement for such services.

189.    NY Ortho Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

vi.    Weinstein Defendants' Participation in the Fraud Scheme

190.    Since at least 2018, the Weinstein Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

191.    Weinstein, as an orthopedic surgeon and a principal of the Weinstein Practice, controlled and directed the medical services provided to Claimants by the Weinstein Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents and referring Claimants to the Medical Provider Defendants for radiological services.

192.    Castro, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants by the Weinstein Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

193.    As part of the Fraud Scheme, Weinstein Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

194.    As part of the Fraud Scheme, Weinstein Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

195.    As part of the Fraud Scheme, Weinstein Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value

to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

196.    Weinstein Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Weinstein, Castro and/or any other employee/agent of Weinstein Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

197.    Weinstein Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Weinstein, Castro and/or any other employee/agent of Weinstein Practice provided medical and diagnostic services and received reimbursement for such services.

198.    Upon information and belief Weinstein Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

vii.    Merola's Participation in the Fraud Scheme

199.    Since at least 2018, Merola has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

200.    Merola, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents and referring Claimants to the Medical Provider Defendants for radiological services.

201.    As part of the Fraud Scheme, Merola intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

202.    As part of the Fraud Scheme, Merola provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

203.    As part of the Fraud Scheme, Merola provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

204.    Merola knowingly profited from reimbursements for the alleged medical and diagnostic services that he rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

205.    Merola also knowingly profited from the increased number of patients who were referred to him as part of the Fraud Scheme, for whom he provided medical and diagnostic services and received reimbursement for such services.

206.    Merola also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

viii.    Kolb Defendants' Participation in the Fraud Scheme

207.    Since at least 2018, Kolb Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

208.    Kolb, as a radiologist and a principal of Kolb Practice, controlled and directed the medical services provided to Claimants by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

209.    As part of the Fraud Scheme, Kolb Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

210.    As part of the Fraud Scheme, Kolb Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

211.    As part of the Fraud Scheme, Kolb Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants,

knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

212.    Kolb Defendants knowingly profited from reimbursements for the alleged imaging and diagnostic services rendered by Kolb, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

213.    Kolb Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Kolb provided imaging and diagnostic services and received reimbursement for such services.

214.    Kolb Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

ix.    Lenox Practice's Participation in the Fraud Scheme

215.    Since at least 2018, Lenox Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

216.    Lenox Practice, as radiologists, controlled and directed the medical services provided to Claimants by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

217.    As part of the Fraud Scheme, Lenox Practice intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman,

the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

218.    As part of the Fraud Scheme, Lenox Practice provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

219.    As part of the Fraud Scheme, Lenox Practice provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

220.    Lenox Practice knowingly profited from reimbursements for the alleged imaging and diagnostic services rendered by Lenox Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

221.    Lenox Practice also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom they provided imaging and diagnostic services and received reimbursement for such services.

222.    Upon information and belief, Lenox Practice also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

          x.    <u>RJ PT Practice's Participation in the Fraud Scheme</u>

223.    Since at least 2018, RJ PT Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

224.    RJ PT Practice, as physical therapists, controlled and directed the medical services provided to Claimants by RJ PT Practice, evaluating and providing physical therapy sessions that were not medically necessary and/or not causally related to the alleged accident.

225.    As part of the Fraud Scheme, RJ PT Practice intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

226.    As part of the Fraud Scheme, RJ PT Practice provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

227.    As part of the Fraud Scheme, RJ PT Practice provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants,

knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

228.    RJ PT Practice knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by RJ PT Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

229.    RJ PT Practice also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom RJ PT Practice provided medical and diagnostic services and received reimbursement for such services.

230.    Upon information and belief, RJ PT Practice also knowingly profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

xi.    Cross Bay Defendants' Participation in the Fraud Scheme

231.    Since at least 2018, Cross Bay Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

232.    Tomasello, as an orthopedic surgeon and a principal of Cross Bay Practice, controlled and directed the medical services provided to Claimants by Cross Bay Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents and referring Claimants to the Medical Provider Defendants for radiological services.

233.    As part of the Fraud Scheme, Cross Bay Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

234.    As part of the Fraud Scheme, Cross Bay Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

235.    As part of the Fraud Scheme, Cross Bay Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

236.    Cross Bay Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Tomasello and/or any other employee/agent of Cross Bay Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

237.    Cross Bay Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Tomasello and/or any

---

other employee/agent of Cross Bay Practice provided medical and diagnostic services and received reimbursement for such services.

238.    Upon information and belief, Cross Bay Defendants also knowing profited by receiving a portion of the proceeds of the high-interest funding loans provided by the Funding Defendants to the Claimants.

xii.    NYC MNO Defendants' Participation in the Fraud Scheme

239.    Since at least 2018, NYC MNO Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

240.    Golzad, as a neurologist and a principal of NYC MNO Practice, controlled and directed the medical services provided to Claimants by NYC MNO Practice, including evaluating and providing therapies that were not medically necessary and/or not causally related to the alleged accidents.

241.    As part of the Fraud Scheme, NYC MNO Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

242.    As part of the Fraud Scheme, NYC MNO Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

243.    As part of the Fraud Scheme, NYC MNO Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

244.    NYC MNO Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Golzad and/or any other employee/agent of NYC MNO Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

245.    NYC MNO Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for Golzad and/or any other employee/agent of NYC MNO Practice provided medical and diagnostic services and received reimbursement for such services.

246.    Upon information and belief, NYC MNO Defendants also knowing profited by receiving a portion of the proceeds of the high-interest funding loans provided by the Funding Defendants to the Claimants.

xiii.    Hudson Defendants' Participation in the Fraud Scheme

247.    Since at least 2018, Hudson Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

248.    Isaac, as an orthopedic surgeon and a principal of Hudson Practice, controlled and directed the medical services provided to Claimants by Hudson Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

249.    As part of the Fraud Scheme, Hudson Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

250.    As part of the Fraud Scheme, Hudson Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

251.    As part of the Fraud Scheme, Hudson Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

252.    Hudson Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Isaac and/or any other employee/agent of Hudson

Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

253.    Hudson Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Isaac and/or any other employee/agent of Hudson Practice provided medical and diagnostic services and received reimbursement for such services.

254.    Upon information and belief, Hudson Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

xiv.    CitiMed Defendants' Participation in the Fraud Scheme

255.    Since at least 2018, CitiMed Defendants have been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

256.    CitiMed Practice provides a variety of medical services, including diagnostic, imaging, neurological evaluations and treatment, physical therapy, orthopedic surgery and pain management. As such, CitiMed Practice controlled and directed the medical services provided to Claimants by the physicians associated with and/or employed by CitiMed Practice, including a) evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents; b) evaluating and providing injections that were not medically necessary and/or not causally related to the alleged accidents; and c) providing radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

257.    CitiMed Practice also operates several ambulatory surgical centers, including Defendants SCOB and HealthPlus SC, which have a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed.  *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

258.    SCOB and HealthPlus SC, as ambulatory surgical centers, controlled and directed their facility where they contributed resources to other Medical Provider Defendants who they knew or should have known provided treatment to Claimants, including performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

259.    As part of the Fraud Scheme, CitiMed Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

260.    As part of the Fraud Scheme, CitiMed Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Medical Service Providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

261.    As part of the Fraud Scheme, CitiMed Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value

to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

262.    CitiMed Defendants knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

263.    CitiMed Defendants also knowingly profited from the increased number of patients who were referred to CitiMed Defendants and/or treated at CitiMed Defendants' surgery centers as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

264.    Upon information and belief, CitiMed Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by the Funding Defendants to the Claimants.

xv.    Pain Defendants' Participation in the Fraud Scheme

265.    Since at least 2018, BL Pain Practice and Pain Physicians Practice have been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

266.    Reyfman, as an anesthesiologist and interventional pain management and a principal of BL Pain Practice and Pain Physicians Practice, controlled and directed the medical services provided to Claimants by BL Pain Practice and Pain Physicians Practice, including evaluating and providing injections that were not medically necessary and/or not causally related to the alleged accidents.

267.    Kosharskyy, as an anesthesiologist and interventional pain management and a principal of BL Pain Practice and Pain Physicians Practice, controlled and directed the medical services provided to Claimants by BL Pain Practice and Pain Physicians Practice, including evaluating and providing injections that were not medically necessary and/or not causally related to the alleged accidents

268.    As part of the Fraud Scheme, Pain Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

269.    As part of the Fraud Scheme, Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

270.    As part of the Fraud Scheme, Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

271.    Pain Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Reyfman, Kosharskyy, and/or any other employee/agent of

BL Pain Practice and/or Pain Physicians Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

272.    Pain Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Reyfman, Kosharskyy, and/or any other employee/agent of BL Pain Practice and/or Pain Physicians Practice provided medical and diagnostic services and received reimbursement for such services.

273.    Upon information and belief, Pain Defendants also knowing profited by receiving a portion of the proceeds of high-interest funding loans provided by Funding Defendants to the Claimants.

xvi.    NQSC's Participation in the Fraud Scheme

274.    Since at least 2018, NQSC has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

275.    NQSC is an ambulatory surgical center with a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed. *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

276.    NQSC, as an ambulatory surgical center, controlled and directed its facility where it contributed resources to other medical service providers who it knew or should have known provided treatment to Claimants, including performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

277.    As part of the Fraud Scheme, NQSC intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

278.    As part of the Fraud Scheme, NQSC provided fraudulent medical documentation by mail, facsimile and/or email to Medical Provider Defendants knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

279.    As part of the Fraud Scheme, NQSC provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

280.    NQSC knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

281.    NQSC also knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

xvii.   <u>S5A's Participation in the Fraud Scheme</u>

282.    Since at least 2018, S5A has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

283.    S5A is an ambulatory surgical center with a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed.  *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

284.    S5A, as an ambulatory surgical center, controlled and directed its facility where it contributed resources to other medical service providers who it knew or should have known provided treatment to Claimants, including performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

285.    As part of the Fraud Scheme, S5A intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

286.    As part of the Fraud Scheme, S5A provided fraudulent medical documentation by mail, facsimile and/or email to Medical Provider Defendants knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

287.    As part of the Fraud Scheme, S5A provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

288.    S5A knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

289.    S5A also knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

xviii.    Manhattan SC's Participation in the Fraud Scheme

290.    Since at least 2018, Manhattan SC has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

291.    Manhattan SC is an ambulatory surgical center with a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed.  *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

292.    Manhattan SC, as an ambulatory surgical center, medical service providers Provider Defendants who it knew or should have known provided treatment to Claimants, including

performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

293.     As part of the Fraud Scheme, Manhattan SC intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

294.     As part of the Fraud Scheme, Manhattan SC provided fraudulent medical documentation by mail, facsimile and/or email to Medical Service Providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

295.     As part of the Fraud Scheme, Manhattan SC provided fraudulent medical documentation by mail, facsimile and/or email to Wingate Defendants and/or Bangel Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

296.     Manhattan SC knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

297.    Manhattan SC also knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

**D.    Defendants' Pattern of Racketeering Activity**

298.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others, began on or before 2018, and continues to the present day, and includes among others: *See* Pattern of Racketeering Activity – Predicate Acts, attached hereto as **Exhibit A**.

**IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE**

299.    Tradesman is under a statutory obligation to promptly and fairly pay or object to claims within 45 days. *See* New York Workers' Compensation § 13-5(1). Nevertheless, supporting medical documentation is often not received by Tradesman until after the 45 day deadline to object.

300.    The invoices and documentation supporting the Fraud Scheme submitted to Tradesman, the New York State Workers' Compensation Board, the New York Unified Court System, and others contained materially false statements and were designed to conceal materially false statements.

301.    As such, Tradesman justifiably and reasonably relied on them as facially valid.

**V.    DAMAGES**

302.    Plaintiff Roosevelt is a reinsurer which underwrites policies and provides reinsurance that covers the various workers' compensation claims and personal injury lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme. As such, Roosevelt is a party directly and ultimately damaged by the Fraud Scheme.

303.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal Defendants on behalf of Claimants.

304.    But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would be less significant, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses.

305.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred general liability claim adjustment expenses progressively rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019 (159% increase from 2018), to $58,694,694.00 in 2020 (61% increase from 2019), to $91,334,395.00 in 2021 (56% increase from 2020), and to $142,127,559.00 in 2022 (56% increase from 2021 and 914% increase in four years).

306.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed February 15, 2024.

307.    The drastically escalating cost of construction-related claims in both the Workers' Compensation and general liability areas stands in marked contrast to the overall decreasing

number of workplace injuries, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022 (a 27% decrease). *See e.g.*, "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed February 15, 2024. The number of workplace incidents decreased from 1,193 in 2018 to 751 in 2022, a 37% decrease. *Id.*

308.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466,* incorporated herein by reference, last accesses August 5, 2024.

309.    The study goes on to say that construction insurance costs are the highest when compared to nearby states such as Connecticut, New Jersey and Pennsylvania at a rate of 12.5% of a project's costs versus 2.5%, respectively. *Id.*

310.    Further, the study cites information that an average Labor Law 240(1) claim will settle for above $1 million, however, if there is a neck or back surgery involved, the claim value averages between $2 million to $3 million or more. *Id.*

311.    In the face of fraudulent insurance claims, much like the defendants' Fraud Scheme, the New York Legislature has introduced a bill making the staging of a construction accident and the encouraging and assisting the same, a Class E Felony in the State of New York. That bill is currently pending.

312.    Plaintiff Tradesman serves as a management general agency that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including

general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

313.    Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme.

314.    Due to Defendants' perpetration of the Fraud Scheme, numerous insurance carriers have ceased to write Workers' Compensation and/or general liability policies in the State of New York, which has resulted in damage to Tradesman's business

315.    Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation (whereas Plaintiff's damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

  a. Plaintiff Roosevelt – Actual and consequential damages for the payments such Plaintiff made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Laws and New York's Labor Laws, the exact amount to be determined at trial.

  b. Plaintiff Tradesman – Actual and consequential damages for the damage to Tradesman business including, but not limited to, expenses incurred for the

administration of these claims and the retention of additional staff to perform investigative and support services for claims wherein the Defendants are submitting or causing to be submitted claims/demands for monetary payments in connection with New York's Workers' Compensation Law and New York's Labor Laws, the exact amount to be determined at trial.

## VI.    CAUSES OF ACTION

### COUNT I
### RICO Violation (§ 1962(c))
### (Against All Defendants)

316.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

317.    At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation or management of the enterprise, which Wingate Firm orchestrated, coordinated and led.

318.    In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See* Exhibit A  (RICO Predicate Acts List).

319.    Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

320.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibit, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

321.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

322.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.    Such other relief as the Court deems just and proper.

## COUNT II
## RICO Violation (§ 1962(d))
## (Against All Defendants)

323.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

324.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

325.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibit, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

326.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

327.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

      b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

      c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

      d.    Such other relief as the Court deems just and proper.

### COUNT III
### Common Law Fraud
### (Against Legal Service Defendants and Medical Provider Defendants (collectively, "Count III Defendants"))

328.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

329.    The Count III Defendants made misrepresentations of facts, deliberately concealed, omitted materials facts that they had a duty to disclose in connection with their claims for reimbursement and/or payment under New York law.

330.    These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

331.    The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

332.    The Count III Defendants made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

333.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

334.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of the Count III Defendants' representations concerning their eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of the Count III Defendants' scheme and artifice to defraud them.

335.    The Count III Defendants knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their truthfulness.

336.    But for the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid workers' compensation and general liability insurance benefits.

337.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count III Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

338.    As a direct and proximate cause of the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count III Defendants, Plaintiffs have been damaged. Plaintiffs' damages include, but are not necessarily

limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs to the Count III Defendants or caused by the Count III Defendants.

339.    Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Count III Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiffs' actual and consequential damages to be established at trial;

      b.    Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendant's illegal conduct; and

      c.    Such other relief as the Court deems just and proper.

## COUNT IV
## Unjust Enrichment
## (Against Legal Service Defendants and Medical Provider
## Defendants (collectively, "Count IV Defendants"))

340.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

341.    As described above, the Count IV Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

342.    The Count IV Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

343.    When Plaintiffs paid the Count IV Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations

and omissions that the Count IV Defendants, or those persons working under their control, made concerning the Count IV Defendants' eligibility to make claims or seek reimbursement under New York law.

344.    Each and every payment that Plaintiffs made or was caused to make to the Count IV Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count IV Defendants sought and voluntarily accepted.

345.    Throughout the course of their scheme, the Count IV Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

346.    Retention of those benefits by the Count IV Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Count IV Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiffs' actual and consequential damages to be established at trial; and

    b.    Such other relief as the Court deems just and proper.

## COUNT V
### Declaratory Relief Pursuant to 28 U.S.C. § 2201
### (Against Legal Service Defendants and Medical Provider Defendants (collectively, "Count V Defendants"))

347.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

348.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

349.    There is an actual case and controversy between Plaintiffs on the one hand, and the Count V Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, surgeries, and physical therapy that have not been paid to date and through the pendency of this litigation. Plaintiffs contend these Count V Defendants are not entitled to reimbursement for any of these charges.

350.    Because these Count V Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Count V Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

a.    A declaration that the Count V Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

b.    Declare that the Count V Defendants' activities are unlawful;

c.    Declare that Plaintiffs have no obligation to pay any pending, previously-denied, and/or future workers' compensation or general liability insurance claims submitted by the Count V Defendants; and

d.    Such other relief as the Court deems just and proper.

## VII.    <u>JURY TRIAL DEMAND</u>

351.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

---

**COMPLAINT**

Dated: September 6, 2024

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**


By: */s/  William J. Clay*

**WILLIAM J. CLAY** *(admitted pro hac)*
**MICHAEL A. GRAVES**
**AARON E. MEYER**
**KIRK D. WILLIS** *(admitted pro hac)*
1985 Forest Lane
Garland, Texas 75042
Telephone:  214-736-9433
Facsimile:   214-736-9994
Service Email: service@thewillislawgroup.com

*ATTORNEYS FOR THE PLAINTIFFS*
ROOSEVELT ROAD RE, LTD. AND
TRADESMAN PROGRAM MANAGERS, LLC